You may begin whenever you're ready. Yes, thank you, Your Honor. And good morning, Your Honors. My name is Andre Giardini. I'm here for Christopher Mendoza, who's the appellant, and he's sued under the Private Attorney General Act, so we're here also in the interest of the State of California. We have a case involving the day of rest statute, as the Court knows, where – Counsel, may I – this is actually going to be a question for all parties. So why shouldn't we certify these issues to the California Supreme Court? We have three statutes, or three issues, under the California wage and hour statutes. We were unable to find, and the parties haven't pointed us to any definitive interpretation of any of them by the California appellate courts. The wage and hour rules don't directly deal with them, either. So why should we be guessing on something that affects, you know, 12,000 Nordstrom employees and untold thousands of other California employees, since our job is just to predict what the California Supreme Court would do? I have to say, frankly, Your Honors, I considered that. I wasn't going to ask for that, because I think – Well, it's sui sponse. Parties really generally don't – Right. Right. And the reason that it occurs to me that it may not be necessary, and this is obviously within your purview to decide, but the case law is, I think, sufficiently clear. It doesn't need to go to the California Supreme Court every time the same arguments are made about another aspect of workplace rights. Well, you say it's sufficiently clear. I understand that everyone here, they all want to win, okay? And we can decide this case. The court was removed. We can decide – you know, we can guess what the California courts would say. But the problem is, they haven't said anything. Well, they've said a lot of things, but not on this particular statute. That's exactly the premise of my question. Right. And this statute is going to keep coming up. It's not – this is not a one-off case. Or tell me why it is a one-off case, because I don't think it's a one-off case. It's not a one-off case, Your Honor. You're correct about that, of course. I think, though, that the bar that does employment cases waited for a long time for the Brinker decision and what it would mean. And it means way less than it was set up to mean for the employer side of things. They thought it would do away with class actions. But it's on slightly different issues. It really doesn't directly – again, directly answer questions like, is the day-of-rest statute about every rolling seven days, or is it about a work week? There's no California appellate decision that I could find that answers that specific question either way. No. Brinker, too, talked about provide. Here, we have to talk about cause. And I think that – I think the Court in this case decided it – I think it was going to be a different result until Brinker came out. I think that this district judge looked at what they said provide meant and considered it in assessing cause. So Brinker's not – it doesn't answer it, but it informs it. The sequence is exactly as you have stated. Here's the kernel, though, that is clear in California law and might lead to this panel's decision in this case. And that's this. And it's not just Brinker, but it's Falkenberry after Brinker. If you don't have as an employer a policy that is compliant with the law of the State in terms of liability, if you don't, that's enough to establish liability. You don't get – But, see, that begs the question whether the policy complies, because as I understand the facts, if the day of rest statute applies to the fixed work week, which is the standard labor law thing that overtime pay and so forth is dealt with, if that's true, then, as I understand it, there has been no violation of the law. Because if you're – if you have the day off the first day of the first work week and the last day of the second work week, under one interpretation, that is fine. And under the other interpretation, that is a violation. So we don't know whether the policy complies. I think, like with any statute, though, if the statute, for instance, is termed the word days and not week, and week is used a lot of other places, there's no doubt about it, but in that statute – But what appears in the wage and hour order? That's your problem. It doesn't appear in a manner that is 100 percent clear in answering this question, but it does seem to assume that the work week is the unit. Many of the – many of the rights of employees are measured by the work week. Overtime, for instance, clearly. And daily overtime is another thing. But even in this context, the regulation refers to work week. It does with regard to the exception for part-time. You are correct. But that does not import the word week into the statute, 551 and 552. We don't know how that – that's exactly – the relationship between the statutory text and the regulation, speaking for myself, is murky. And if we look at it and we think it's murky, I don't understand why we should be in a position to guess and not ask. Okay. On the work week issue, one other point I would make, since we have significant data for a limited period of how Nordstrom's has worked its employees, many, many, many circumstances are well beyond one week in length, up to 53 days of sequential work. So the work week issue, however you interpret that, is not going – I mean, they don't – Now, if your client suffered no harm, then there's a question about whether the case can go forward. So if your client was treated correctly, that raises other issues. But on that issue, I think he has a week that's 11 days, and I think the math in my mind makes me understand that that wouldn't – either way you interpret it, work week, I think he would be – No, it would, because if you take a 14-day period and you have day one off and day 14 off, you'd work 12 consecutive days, and that would be fine. Right. A week meaning seven days, though. You know, how do you get to 11 without days? I guess it's – I don't know. It's in my mind. It may be possible. It's certainly possible. It's not a complicated math problem to get to 11 in a row that do not have more than seven in one work week if you put those days off on the ends. But let me ask this. What is your best authority under California Supreme Court law that would suggest that a company like Nordstrom causes the excessive work or work days if they don't schedule it initially, but just sort of make it once more hours? Well, I think Brinker talks about the disparity of power in the workplace, and it is clear, I think, from this record that Nordstrom schedules its employees to work when they work. In the circumstances in my client's case, he was asked by a supervisor to work. That's causing that to happen. They don't – these employees get to simply because they want more work. Nordstrom strictly controls how much overtime people get, and they wouldn't allow that amount of freedom on the side of the employee. Nordstrom schedules employees to work more than seven days in a row, and their data shows that. We have limited information for a period about scheduling, and even with that, it shows they schedule people more than seven days in a row regardless of how the week is computed. So the – Justice Gould, the question really is the discussion of the importance of these protections in the workplace, the power of the employer, all of which are discussed in the Brinker case, spent a lot of time discussing that in the context of meal breaks and rest breaks. And by the way But even if they do schedule it, okay, but let's say the situation is where a I'm getting divorced or, hey, I got a kid in college, I want to work as much as you, you know, would allow me to work. And so then they schedule it. So did they cause that person to work that way? Or In my view, yes. And for the – that's getting to the waiver issue, which I think Nordstrom doesn't really want to discuss, because you can't waive mandatory workplace rights like overtime, seventh day of rest, minimum wage and the like. But it isn't – it isn't actually a waiver when you're scheduled to work. If you decide, for whatever reason, and employees have a lot of reasons, some of them valid and some of them not so valid, about not wanting to work. And some really do want to work. But if you're scheduled, you work. If you want a job, you work. It's a chicken and egg question. If someone says, as I believe one of the principals in this case did, I'd like to work more hours so I can get health benefits. Or I'd like to work as many overtime hours as you're willing to give me so that I can, you know, take home more money than I need. And then they are scheduled. Yes, in one sense the scheduling causes the work, but in another sense the employer causes the scheduling that causes the work. So where do we start? Well, I'd always start with the employer. Well, of course you would. But it doesn't happen unless it suits Nordstrom's business purpose. That's the takeaway from this. And I think the thought that the employees are controlling that is a myth. What if they actually don't care? What if there's evidence that somebody, you know, two friends asked to trade shifts because it's more convenient for both of them who have dental appointments. And Nordstrom says, fine, we don't care which of you works. Take your pick. And that causes one of them to work more than the seven days or whatever. Is that still Nordstrom causing it? I think you have to return to, like, first principles. What does the statute say and who has the power? This happened 26,000 times where people worked seven or more days. In this limited period where we had data, this is not just a one-off with somebody swapping. Give us your best case on cause after Brinker. Because Brinker says provide. Give us your best case on cause. There isn't a case that defines cause in a workplace environment. Falkenberry says if you don't have a compliant policy, and I don't think Nordstrom's does, that's enough to establish liability. You never get to the waiver question. And I think that that's a pretty clean way to look at this. Brinker and Falkenberry and the rights that that establishes, you don't ask the question of, and in those cases they're talking about are there individual facts that prevent class certification. But it's the same thing. Do you know, and I hope that other counsel will address this as well, if the correct unit of measurement for the seven-day issue is the workweek and not a rolling seven days, are there any cases in which an employee during the relevant period did not get one day off during the workweek? That is, in my example, day one and day 14 would be okay. Are there any facts in the data that we looked at? Yes. We listed many of the more extreme examples in our opening brief. There's the shoeshine guy that worked 48 straight days. That's across a lot of weeks, one day off, and then worked 26 more days after that. There's the other person that worked in cosmetics, I think it was, 53 straight days. There's the employee we listed, one single employee that had runs of 20, 13, 20, you know, and one after another after another. And these are the ones that we could find from the information that we've been provided. There's more. This is a company that didn't know what the statute required. After the suit was filed, their current attorneys asked the DLSC to, in a letter, to help them to understand what it meant. So they can't, Department of Labor Standards Enforcement, they give you letter opinions on occasion if you have a question as an employer or employee or somebody like that. In any event, if they don't know what the rule is, they're not following the rule, and their data shows they're not following the rule. And I know what the Court is going to ask me, well, how do we know that that's the rule? But in this case, there's precious little doubt that however you define those statutes, they've been violated in a wholesale way. Every one of those 26,000 events, if my interpretation is correct, is a misdemeanor. I mean, if I'm an individual and come before the Court with my third, fourth, or fifth misdemeanor, woe be unto me that the Court will think that I have a problem. Well, they have a 26,000 times problem in the time in which we're looking at, and it's not stopped. They don't have a policy to this day, at least that we know of, that has changed. So this continues on and on and on at least 10,000 times a year. So there's a big, big issue here. I don't think they're unique in the world either. And if you hadn't noticed, you're the appellant here. Yes. It's better to be, always better to be the appellee coming in. So the odds would say. Yeah. I mean, I'm not sure what your fear of certification is. I have no fear of it. I'm just trying to snatch an early victory. Would you like to save some time? I would want to save some time for my co-counsel and then two minutes on rebuttal. Is that possible? Well, then he gets two minutes. Okay. Sorry. Are we at two minutes? We're at four minutes. And he wanted two for rebuttal. So that's between you. If you use it up, it's gone. I will not. I'm very comfortable with Mr. Giardini arguing. My name is Craig Clark, Your Honors. We represent Megan Gordon, who was an intervener in this case. This issue that you're talking about with regard to the, I mean, we're kind of dancing around the word a little bit, but the word is waiver. And that's what the judge found in this case. The waiver, and having a waiver without having a known right, a known, a waiver has to be a waiver of a known right. Going back to this Brinker issue, and I think Brinker was kind of the flavor of the month or flavor of the multi-years, if you will, at the time that it came down. All of the lawyers that litigated in this area and all of the judges who are obviously judging in this area had anticipated Brinker. And Brinker came down right at the time that we were litigating this case. Counsel? Yes. We've read Brinker. What I'm curious about is your position on certification. Do you think it's a good idea, a bad idea, or are you indifferent? It's interesting. I've not discussed this with Mr. Giardini, although I have with my partner. And we actually believe that certification may be we are not surprised at this question. It may very well be appropriate to certify this to the Supreme Court. I agree with Mr. Giardini. I think there is enough information here on multiple violations, on Nordstrom's not having a policy of any kind in place that addresses this issue. These employees who supposedly waived their rights have no knowledge of the rights. Well, it's not a question of waiver, at least as I see it. It's a question of what has caused me. And until we know that, we don't know whether the statute is or isn't. I understand, Your Honor. I would say that caused does not mean permit, which is what the Brinker court was dealing with, was permit. Was it provide? Provide. I'm sorry, Your Honor. Thank you. Provide. You're absolutely correct. And cause is certainly a different standard than provide. But even if we take Brinker, if we use those same terms synonymously, the thing that Brinker stood for, and certainly that's what has come to stand for, is that a company has to have a policy. They have to have some. But they also don't have to prevent an employee from not taking their break in that case. It's not their job to come and police it if somebody doesn't take it. You're absolutely correct, Your Honor. It is not their job to police it, but it is their job to have a policy in place and make sure that the employees are aware of the policy so that the employees have the right to take advantage of that. And in this case, that never happened. So we never even get to the threshold of the Brinker question. I think we understand your position. You're down to a minute and a half. I'm going to reserve for Mr. Giardini. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors. My name is Julie Dunn, and I'm appearing on behalf of Apelli Nordstrom, Inc. Your Honors, would you like me to begin with the question of certification? Sure. So I think in order to resolve this case, there are indeed several day of rest statutes, but there's only one that if you resolve today, the causation one, eliminates everything downstream. It eliminates the workweek question. It eliminates how do you apply 556. So if you look at causation alone, and you know that that resolves this whole case. Well, we can resolve the case, but we won't resolve the issues. What you're saying is we can resolve the case that way and not have to speak to those issues. That is correct. That is correct. But it doesn't mean the next case down the line isn't going to have the, you know, it doesn't make the issues go away. That's correct. Now, with respect to that, Your Honor, at the time that we were litigating in the trial court, I was aware of one other day of rest case that has since gone away. I am not aware of a watershed of day of rest cases. I think that's important. I think that part of the reason for that is, in fact, the Brinker, California Supreme Court decision. The parallels between these two sets of statutes are so close that I don't think others. It's a completely different statute. The wording, at least, is completely different. And it seems to me that I would have a hard time if I were looking at Federal statutes that were this different saying, oh, well, there's a case on this one, so we'll just apply it over here. The rest breaks and meal breaks statute doesn't have the same ambiguity about week or day for a start. And it doesn't use the word cause, which is where you began your argument. And just if we start where you want us to start, which is with causation, I didn't find any cases in the California appellate courts that define cause within the wage and hour world. Is there something I missed? There is not, Your Honor. Okay. So why wouldn't that issue alone have to go to the California Supreme Court? Here's why, Your Honors. So let's just start with the basic rules of statutory construction. You have Labor Code section 551 that says every employee is entitled to one day's rest in seven. If you look at the dictionary definition of entitled to, it means to be furnished with, very similar to be provided with. The second, Labor Code section 552, says no employer shall cause an employee to work more than six days in seven. Now, if you look up in a dictionary what does cause mean, it's going to be to compel, to force something to happen. But even assuming there's ambiguity with respect to that, what would the rules of statutory construction tell us to do next? They would ask us to look to a few different things, the statutory structure in which this statute appears, number one, and two, the legislative history. Now, remember from the briefing. There's not much legislative history. There's actually a tremendous amount. On cause? With respect to cause, Your Honor. So if you look at the Industrial Welfare Commission orders, and just by way of background you have the legislature that writes the statutes, you have the Industrial Welfare Commission that writes regulations to explain the statutes, and those regulations are to be given full legislative credence. They're the same as a statute. They're subject to the law. I would disagree respectfully, Your Honor, with respect to that. So let's talk about those. First created, the statute was written in 1893, the first time we see a day of rest statute. It's applicable to men. Well, applicable to all employees. In 1917, the IWC was tasked, it was created and tasked with creating working conditions for women and minors that were more protective than the working conditions for men. So as you saw from our briefing, if you go through the history of those wage orders, what they tell us is at the outset there was an absolute prohibition on permitting, permitting, and that word is used, no employer may suffer or permit a woman or minor to work more than six days and seven. And then they actually designated the day of rest. As our society has evolved, so did the individuals. I agree that they're not going to go back to the original wage orders. That would be an unequal treatment under the law. You can't have one set of rules for women and another for men. But in 1917, they did. And then as time went on, they amended it.    And then in 1916, they did. They amended these Industrial Welfare Commission orders, and they put women on the same footing as men. And this is where it gets critical, because when you read the wage orders now, they say seven consecutive days in a work week is permissible so long as you pay the overtime premium. So now we're looking at causation based on the plain language of the statute, plain language says no employer shall cause in 1893. In 1917, when the Industrial Welfare Commission wants to create greater protections for women and children, it doesn't even repeat the language of the statute. Instead, it's clear it's more protective because it says no employer shall permit a woman or a man. There's a fair amount of space between your suggestion that it means coerce and to permit at the other end. And there's a huge, huge gap there. And where does cause fall within that? It is a reasonable interpretation to take your opponent's view that scheduling that time is causing it to happen. By writing it in the schedule, that's the only way the employee can work, so you therefore cause them to work. It's also plausible to adopt your view, which is you have to really push it when they don't want to do it for it to be causing them, and it doesn't cover things that are voluntary. I don't see the wage orders or the history as resolving that question. Your Honor, with respect to even if we had a broader reading of cause in something less than require but more than permit, even under the evidence submitted in this case, the trial court had concluded that if you wanted to know what caused Mr. Mendoza and Ms. Gordon to work more than six consecutive days, it was in fact their own conduct. So let's look at Mr. Mendoza. How does that deal with the other employees that were given as an example of the ones who worked 53 days where it doesn't matter whether it's a work week or a rolling seven days? It's a very good question. So what the trial court did was say going into trial, he was prepared, and on the Thursday before the Tuesday that trial began, we were going to do a statewide trial. But when he absorbed these issues, the trial court said what we're going to do is try these two plaintiffs' claims alone, and then once I understand the legal issues, we're going to see if this can be tried on a representative basis.  No, I understand the procedure. I want to just cut to the chase. Your view is that if these two individuals have no claim, the case goes away and we don't have to think about the 53 days. Is that a fair summary? In part, that is fair. So the two claims go away. We don't have Article III jurisdiction. We don't have standing any longer under PAGA, because as we know, to have standing to prosecute a PAGA claim, you have to have exhausted administrative remedies. The record is clear. Mr. Mendoza was the only person who had done that. So no other employee could really come forward to prosecute a PAGA action. They hadn't been deputized. But that's only half the story, Your Honors. We know from both the post-trial order to show cause issued by Judge Kearney that he was concerned about the ability of a trial court to litigate this case on a representative basis. So if we look at that in particular, his testimony or his testimony. I'm sorry. The only thing I'm saying is that it was removed under the PAGA. It was a – it wasn't on these particular issues. Wasn't it removed? It's diversity. And diversity jurisdiction. That is correct. And there is the issue. They never got to the class certification issue. That is correct. Or something that – something happened at summary judgment or whatever on that. I'll tell you what happened with the class certification aspect of it. If you go back and look at the notice of motion for class certification, it was a conditional notice. And plaintiffs said to the court, we are filing this motion for class certification because Nordstrom has raised the claim that we must do that in federal court to move forward. But should the trial court conclude that we don't have to certify a class, we request to withdraw our motion for class certification and proceed on a PAGA representative basis. So with respect to that, there was briefing about can they proceed as a representative action without certifying the class. The trial court agreed with plaintiffs on that issue and then further granted their motion to withdraw their own motion for class certification. And so the fact that we got to trial as a PAGA representative action rather than a class action was entirely at the election of the plaintiffs. So then when we get to trial, this manageability issue becomes significant because, one, again, let's talk about that cause and that finding that Judge Carney made. He had concluded that because Mr. Mendoza had gone to his coworkers and said, I would like additional shifts, please notify me if they are available, that he himself was the cause of his having worked more than six consecutive  Likewise, with respect to Ms. Gordon, the trial court considered all of the evidence, including And that's right or wrong, depending on what cause means. But I want to go back to your earlier question about what cause means something broader than require, something more. It could mean just scheduling the shifts. That's what the plaintiffs are arguing, and it's a permissible reading of the statute. I believe that their argument is not scheduling the shifts, but permitting employees to pick up or agree to work additional shifts. I think that's the core of it. Well, maybe they can speak for themselves. I understood them to be saying that any time Nordstrom puts a person's name on the roster to work, you are going to work Monday, Wednesday, and Friday of this week, whether you asked for it or I've asked for it, that just the scheduling action is the cause of the work. I would agree with Your Honor that if Nordstrom on its own scheduled the work days, then it is requiring employees to work at I know you don't agree with them. No, I do agree. I do agree with that. You do. So, well, I don't So the point here then is what Nordstrom's practice was, was to provide two rest days in every work week. And for both Mr. Mendoza and Ms. Gordon, it's undisputed in the record. Nordstrom never scheduled them, issued a schedule to them that had them working more than six consecutive But they can't work without being put on the schedule, not pre-scheduled, but put on the schedule. So two employees can't just randomly show up for each other's shifts. Actually But somewhere Right. They would record their time, and the timekeeping system would generate their pay. If you look at the testimony of Mr. Dare, he Also would be able to say, no, you're not going to work. They could come to you and say, well, we want to switch. Or we want, you know, you could say, no, I don't want you in cosmetics. You have a bad way with people. Or your makeup is terrible. You know, we don't want anyone in cosmetics to see you. Or there could be any number of reasons. I'm with you. I'm not saying you, you. But Nordstrom still controls that. Yes. The issue here, though, is that's not what the evidence in the trial court showed. Mr. Dare was asked directly, may employees in your department trade shifts without your permission? His answer was yes. It's not required that you get manager approval. And second, has it ever happened? And he confirmed yes. Employees have traded shifts without getting advance approval from me. I do find out after the fact because, as you know, when people work, they will record their time in a timekeeping system which generates pay. But the issue for both the causation question and then its downstream effect on a statewide representative action is that the trial court concluded, even if you took a broader view of cause, it was Mr. Mendoza's request for extra shifts that caused him to work more than six consecutive days, not Mr. Dare scheduling him to work that way in the first place. And likewise for Ms. Gordon, she admitted that she was, in fact, scheduled off two days in that work week, but she had traded with a co-worker, which then was what caused her to work. No, we're aware of that. Okay. I guess I'm ‑‑ maybe there's not a question in this, but I'm just fascinated that none of you want to go to the California Supreme Court, which is the only place that can definitively interpret any of the statutes that are at issue here. And with respect to that, Your Honor, I think our position is, as the trial court pointed out in its order of dismissal, Rule 15 doesn't permit post-trial amendments of pleadings because there's a firm belief in two things, the expeditious termination of litigation and the finality of judgments. And when we look at how much work was put into this case and by the trial court itself, there is a ‑‑ And you are the appellate, and statistics are in your favor at this point. And there was a hearing, and there's some factual findings. So I understand you're not wanting to go more than ‑‑ I know one person keeps raising his hand over there saying, I want to go, but no one ever asked us. The number of employers and employees who are affected or potentially affected by these interpretations is vast. And most of the cases seem to settle or go away quietly before they get anywhere in the appellate world in California. But it strikes me that we would be on really thin ice to come out and say, we're just going to say this is what this statute means. Your Honor, if I can just point out the parallels between the Brinker decision and the statute. So let's just talk generally. The meal break statute is Labor Code Section 512. In the statutory chapter we're reviewing now, where the day of rest statutes appear, it's in the exact same chapter. It's called the working hours. It starts at 500 and it ends at 556 or 7. If you look at that statutory scheme, its purpose is first it says, here are the maximum number of hours per day and per work week before we trigger overtime. And then the next several statutes create exemptions from that. So what are those exemptions representing? Flexibility in the work day and the work week. Next we have Labor Code Section 512, and that's what the California Supreme Court looked at. And interestingly, I know the reference was made that Labor Code provisions are to be interpreted in a manner that is protective of employee rights. But I did want to note that the Brinker court itself recognized that. At page 1027 of that opinion, the Brinker court said, we know under Kenneth Cole that when we're interpreting a Labor Code provision, we have to do it to protect employee rights. But then they went on at page 1041 to say, in our view, the best way to read this, knowing that we're protecting employee rights, is to say that the employer's obligation is to make a meal period available, and then employees may choose to work through it or not. But employers don't have to force them not to. So then once we get past 512, there's a big gap before we get to 551, 552, 553, et cetera. They're in the same chapter. So the idea should be the same. And remember, they were amended in, I believe, 2000. And the name of the amendment was the 8-Hour Day Restoration and Workplace Flexibility Act. The idea is workplace flexibility. Well, these issues even become more complicated in that I'm a California resident, and I was a state court judge, but that obviously from the standpoint as well, even though, of course, not from their litigation standpoint, but a person that is an employee in California right now, and employers are dealing with Affordable Care Act, you know, and there's all sorts of stuff going on about who's part-time or people want to get benefits and all of those things. And if, you know, the California Supreme Court, even though they have to protect employees, could also be thinking that employees, if they're not allowed to work, then they make no money. They make no money. They can't get benefits. There's any number of things. So, I mean, caring about employees is also if you put too much on businesses, then employees can't work, and that doesn't put food on their tables either. And, Your Honor, that was the whole basis for the trial court's conclusion. That's why he said cause can't mean that employers may not permit employees to work additional shifts. Mr. Mendoza wanted to earn more money. He wanted to maintain his benefits. It's exactly what Brinker said. Look, we guarantee you you have that right to be afforded a 30-minute meal period, but you employees also have the right to decide if I foresee I'm going to work overtime today but I've got to pick the kids up at 530, I can choose to work through my meal period if I wish so that I can leave on time and pick up my kids. It's flexibility. What day of the week does your work week start on? I believe it begins on Sunday. Saturday. Off by a day. I apologize. That was call a friend. I phoned a friend for that one. Yes. Okay. And so, Your Honor, I think the point that Judge Callahan just made is the crucial point for purposes of this analysis. If you line that analysis up with Brinker, it's on all fours. So if we, in conclusion, I'm just going to focus on the testimony of Mr. Mendoza himself, which sums up the entire meaning of this case, and we submitted it at the supplemental excerpt of record at pages 52 and 53. He testified he was struggling financially. As a result, he made a lot of people aware he was available to work extra shifts. When managers or coworkers offered him additional shifts, he said, You can come to me, but I'll decide if I can or can't work. And then asked, Did Nordstrom ever encourage you to work it? Here's what's critical. I don't know if I can speak for Nordstrom in saying they encouraged me to do anything, but I encouraged myself. And he's speaking with respect to picking up the additional shifts. Thank you, Your Honors. We have one of you has about a minute and a half. Thank you, Your Honor. Your Honors. I think maybe the answer to the question, should this go to the Supreme Court, should be yes. Counsel is very persuasive over here. And maybe the best reason for that is that the same judge that ruled in Nordstrom's favor at the end ruled in our favor nearer to the beginning. In May of 2011, and we quoted it in our brief, Judge Carney said that cause means cause or permit. He had the broader meaning in light of the workplace relationship. But now you can't analyze cause without Brinker, so. That's true. That's true. And I think Brinker stands for the proposition that if you don't have a compliant policy, that's all it takes. Brinker was sent back to the trial court. That court, and we attached it as an addendum, certified the class in the meal break. The rest break class had already been certified, and that was upheld by the U.S. Supreme Court. There's two classes going in cases where the rest break says you have to make available a rest break, which is a very low standard. And then the meal break says you have to provide it. Provide is not the same as you're entitled to and shall not cause someone to work more than seven days. It is a stricter thing. But even in Brinker, classes were certified in both of those cases, circumstances. And the evidence at trial was that no one works at Nordstrom without Nordstrom's involvement or consent. And the reason is they don't want to pay overtime. Thank you, counsel. Thank you. The case just argued is submitted, and we appreciate very much, very helpful arguments in this most interesting case. Thank you, Your Honor.
judges: Graber, Gould, Callahan